**PROVIDENCE WASHINGTON INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**James T. LYNN, in his capacity as the Secretary of Housing and Urban Development, Defendant-Appellee.**

**No. 73-1330.**

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1974.

Decided Feb. 21, 1974.

John W. Kershaw, Providence, R. I., for plaintiff-appellant.

Anthony J. Steinmeyer, Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Lincoln C. Almond, U. S. Atty., and Morton Hollander, Atty., Dept. of Justice, were on brief, for defendant-appellee.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges

COFFIN, Chief Judge.

This is an appeal by a private insurance company, insurer of a state prison, from an adverse judgment in its suit against its federal reinsurer, the Department of Housing and Urban Development (HUD). The question for review is whether the district court erred in concluding that the fire loss, under the circumstances described below, was not caused by a "riot" or a "civil disorder" within the meaning of the policy issued pursuant to the Urban Property Protection and Reinsurance Act of 1968, 12 U.S.C. §§ 1749bbb–1749bbb–21.

At about 10:30 in the morning of May 23, 1969, three inmates of the maximum security section of the Adult Correctional Institution (ACI), Cranston, Rhode Island, set fire to the facility by pushing a burning mop through a tiled roof. The resulting conflagration caused physical damage to the building exceeding $300,000. During the fire prisoners in the maximum security section, some of whom were locked in their cells at the time, had to be evacuated, and transferred to other portions of the ACI or to other institutions. Local firefighters and state and local police were called in to control the blaze and assist in maintaining security. No disturbances occurred among the prison population during this time, nor was the arson linked to any other incidents, either prior to or subsequent to this event.

The three perpetrators apparently thought that they were carrying out their deed secretly. Unhappily for them they were seen by other inmates, and after an investigation of the cause of the fire, were indicted, tried, and convicted of arson. Throughout the criminal proceedings the accused prisoners maintained their innocence and no motive for the burning was ever established. Their appeals to the state supreme court were denied, State v. Carsetti, 306 A.2d 166 (R.I. June 1973). The present action is not concerned with criminal responsibility, but seeks to determine, in a dollars and cents meaning, who shall "pay" for the consequences of the crime.

The Adult Correctional Facility was insured by a consortium of companies, including plaintiff Providence Washington Insurance Company. Providence Washington paid out to the state as its share of the loss $69,214. Plaintiff then filed a claim for $37,408.88 under its reinsurance contract with HUD. Under this reinsurance contract, which is the Standard Reinsurance Contract (1969–1970), the government engaged to reimburse the insurance carrier for a set portion of any payments made by the carrier to its insured under certain lines of property insurance so long as the property losses were caused by "riot or civil disorder". The reinsurance was made available by HUD pursuant to 12 U.S.C. § 1749bbb, the National Insurance Development Program, which was part of a package of remedial housing legislation passed by the Congress in the wake of the urban disorders of the mid-1960's.

The plaintiff's reinsurance claim was rejected by HUD on the basis of its finding that the loss was not the result of a riot or civil disorder as defined in the contract. The reasoning of the agency was set forth in a letter dated August 26, 1971 from the Federal Insurance Administrator to plaintiff which letter constitutes the final denial of plaintiff's claim:

"To warrant payment of the Cranston loss it would be necessary to establish either that this loss occurred as a result of a common law riot as defined in paragraph (A) of Section XV(2) of the Contract or else that it occurred in a 'terroristic' manner with 'civil disruption or civil disobedience as a primary motivation' as required by the alternative (B) and (C) definitions of that section.

"We have consistently taken the position that the (B) and (C) definitions, which are in effect extensions of riot coverage under the discretionary authority conferred by the Congress in enacting reinsurance protection against the 1965–1968 type of mass

urban riot, require some showing of racial or other political or quasi-political motivation, rather than merely an unknown motivation or a motive of gain, animosity, diversion (for escape or to cover some other crime) or the like, for essentially personal reasons.

"The transcript of the trial . . . does not sufficiently establish the required quasi-political motivation of the perpetrators . . . nor does it establish that a mass riot (defined as a 'tumultuous disturbance of the public peace') took place. The motivation for the setting of the fire is still essentially unknown.

"Consequently, we do not believe that the motivation test has been met, and the claim is therefore again denied."

After the denial of its claim plaintiff brought this action in the United States District Court for the District of Rhode Island pursuant to the provisions for judicial review of such denials set out in 12 U.S.C. § 1749bbb–11. The district court agreed with the agency that plaintiff had failed to establish that the loss met the definition of "riot or civil disorder" set forth in the reinsurance contract and gave judgment for defendant, Providence Washington Insurance Co. v. Romney, 361 F.Supp 427 (D.R.I.1973).

■ The reinsurance contract contains three definitions of riot or civil disorder, which are set out in section XV(2), paragraphs (A), (B), and (C).[1] Paragraph (B) requires, inter alia, "three or more unlawful and terroristic acts or occurrences" and plaintiff concedes that it is inapplicable here. The two remaining paragraphs require anal-

ysis in order to evaluate plaintiff's contention that both the agency and the court below erred in finding the ACI fire encompassed by neither of them. Paragraph (A) contains the following definition:

"(2) 'riot' or 'civil disorder' means: (A) any tumultuous disturbance of the public peace by three or more persons mutually assisting one another, or otherwise acting in concert, in the execution of a common purpose by the unlawful use of force and violence resulting in property damage of any kind."

It is clear that this definition corresponds with the common law concept of riot. We can find no case dealing with common law riot which would extend that concept so far as to encompass this incident. We therefore agree with the court below that the arson at ACI was not a riot as defined in paragraph (A) of the reinsurance contract.

■ Plaintiffs primarily rely on the *consequences* flowing from the arson, rather than the act of setting the fire itself, to establish a paragraph (A) riot. These consequences include the evacuation and transport of displaced prisoners, the need for increased security, the necessary excitement and activity occasioned by a major fire, and the presumed fear and confusion caused by a blaze in a prison, particularly among those prisoners who were in lockup when the fire broke out. Whether this and other results of the arson at ACI might together constitute a "tumultuous disturbance of the public peace" we need not determine. It is a clear doctrine of

---

1. There is no statutory definition of these terms. 12 U.S.C. § 1749bbb–2(a)(9) defines "losses resulting from riots or civil disorders" as "losses resulting from riots or civil disorders under policies for standard lines of property insurance for which reinsurance is offered under section 1749bbb–7 of this title, as determined under regulations of the Secretary [of HUD]." 12 U.S.C. § 1749bbb–2(b) adds that, "The Secretary is authorized to define, by rules and regulations, any technical or trade term, insofar as such defini-

tion is not inconsistent with the provisions of this subchapter." Although regulations have been published containing definitions of the terms "riot" and "civil disorder", these definitions add little or nothing to those contained in the reinsurance contract. In the regulations in effect at the time this contract was operative the terms are defined in exactly the same language as used in the contract. Present regulations differ slightly, but add nothing of substance.

the common law that a stealthy act of destruction is not transformed into an act of riot because upon later discovery of the damage there is a public disturbance. 11 G. Couch, Cyclopedia of Insurance Law § 42.472 (2d ed. 1963).[2] International Wire Works v. Hanover Fire Ins. Co., 230 Wis. 72, 283 N.W. 292 (1939).

To show that a riot occurred, therefore, plaintiff must show that the act of setting the fire was a tumultuous disturbance of the peace. Plaintiff attempts to demonstrate that it has met this requirement by pointing out that in the indictment of the three accused arsonists is the standard statement that the illegal conduct was "Against the form of the statute in such case made and provided, and against the peace and dignity of the state". But the fact that a felony like arson offends the peace and dignity of the state cannot be construed to be a finding that a riot has occurred. Presumably three undetected nighttime burglars would be similarly charged. Moreover, a riot has a number of additional characteristics, including being "tumultuous". The quiet and stealthy manner in which the ACI fire was set cannot possibly be interpreted as a "tumultuous disturbance of the public peace" unless common sense, as well as common law, be discarded in the process of defining the words. Plaintiff has failed to establish this part of the definition of riot as set out in paragraph (A).

Paragraph (A) also requires that there be "unlawful use of force or violence". In a similar context these terms have been construed as follows:

"The question comes, then on the construction of the terms 'force' or 'violence.' Do they mean merely the manual force necessary to accomplish the act, or do they mean something more? There is no doubt that under the common law 'force or violence' meant a concerted intent of the perpetrators to mutually assist one another against all who should oppose them in the doing of an unlawful act. 3 Greenleaf on Evidence, 16th ed., sec. 216." Walter v. Northern Insurance Co. of New York, 370 Ill. 283, 18 N.E.2d 906, 908 (1939).

The cases wherein destructive activity has been found to be riotous have been ones where the illegal act was accompanied by the use of force, or the threat of use of force, against anyone who might interfere with the criminal enterprise. See e. g., Insurance Co. of North American v. Rosenberg, 25 F.2d 635 (2d Cir. 1928); Brous v. Imperial Assur. Co., 130 Misc. 450, 224 N.Y.S. 136 (1927), aff'd, 223 App.Div. 713, 227 N.Y.S. 777 (1928); Germania Fire Ins. Co. v. Deckard, 3 Ind.App. 361, 28 N.E. 868 (1891). The only other case to construe a reinsurance contract under the National Insurance Development Program reached a conclusion consistent with these cases. In Bituminous Casualty Corp. v. Romney, (amended mem. opinion, E.D.Ky.1973), the court found a riot, as defined in a provision of the contract identical to the one in issue here, in the actions of three or four men who overpowered, bound and threatened the night watchman at a coalfield and who then destroyed valuable mining equipment with explosives. On the other hand, stealthy destructive activity accomplished without force or threat of force to those who might interfere has been found not to constitute a riot, Salem Mfg. Co. v. First American Fire Ins. Co., 111 F.2d 797 (9th Cir. 1940); Hartford Fire Ins. Co. v. War Eagle Coal Co., 295 Fed. 663 (4th Cir. 1924); International Wire Works v. Hanover Fire

---

2. "An offense committed secretly does not constitute a riot. Thus riot insurance contemplates something more than violent acts done by three or more persons in stealth without the knowledge of others who might resist their acts or summon the armed force of the city. Even though there is terror or disturbance at the time the damage is discovered, a crime committed secretly away from the public view is not a riot, for no riot exists in the absence of publicity at the time of the violent or tumultuous acts." 11 G. Couch, Cyclopedia of Insurance Law § 42.472 at 225.

Ins. Co., 230 Wis. 72, 283 N.W. 292 (1939); Walter v. Northern Ins. Co. of New York, *supra*.

◼ Plaintiff argues that the fact that the arsonists were seen in the act of setting the fire makes their action the kind of public display of force which is encompassed within the term "riot". We deem it strange doctrine that if a crime merely happens to be overseen (or overheard), it becomes a riot. Without authorities, we do not embrace it.

Plaintiff has therefore failed to establish those elements of a common law riot which distinguish that crime from all other destructive acts. The act of setting the fire was not a tumultuous public disturbance, and did not involve "unlawful use of force or violence".

Under Paragraph (C) of the reinsurance contract "riot" or "civil disorder" is defined as:

"any other unlawful and terroristic act or occurrence, apparently having civil disruption or civil disobedience as a primary motivation, resulting in intentionally-caused property damage of any kind in the amount of $2,000 or more, which may be determined by the REINSURER, on the basis of evidence submitted by the COMPANY, to have been, under the circumstances, a form of civil disorder."

◼ Plaintiff asserts that the setting of the ACI fire was a terroristic act which, under the circumstances, apparently had civil disruption or civil disobedience as a primary motivation.[3] Although there is absolutely no evidence of the motivation of the perpetrators of the arson, the argument is made that it may be presumed that one who sets fire to a prison intends the kind of results which actually occurred, including evacuation of prisoners, fire fighting efforts, and excitement, and that these results constitute "civil disruption or civil disobedience". Courts normally accord substantial deference to the decisions of administrative agencies acting within the scope of their statutory function, as HUD clearly was doing here. In addition, unlike paragraph (A) this contract provision specifically makes the finding of civil disorder a matter of discretion. It was well within this "double" discretion of the agency to refuse to indulge the presumption as to motivation urged upon it by plaintiff and to disagree with plaintiff that the reaction to the fire constituted civil disruption, civil disobedience or civil disorder.[4]

◼◼ We do not find plaintiff aided by its argument in reference to two criminal statutes passed in the same year as the Reinsurance Act. The Civil Obedience Act of 1968, 18 U.S.C. §§ 231-233, makes it a crime to give certain

3. Plaintiff also asserts that much of paragraph (C) is ambiguous, and that under the insurance law doctrine of construing ambiguous language in an insurance contract against the insurer we should strike the word "terroristic" and the phrase commencing with the word "apparently" and ending with "motivation". Even assuming that the rule of construction against the insurer applies when the insurer is the federal government, *but cf.* Federal Crop. Ins. Corp. v. Merrill, 332 U.S. 380, 383 n. 1, 68 S.Ct. 1, 92 L.Ed. 10 (1947), we can see no ambiguity such as would justify this kind of extensive surgery upon the contract language.

4. In denying the reinsurance claim HUD gave as one ground that plaintiff had failed to show "racial or other political or quasi-political motivation" for the ACI fire. The agency stated that it has "consistently taken the position" that the paragraph (C) (and paragraph (B)) definitions of riot or civil disorder require such a showing. We think it proper to note our concern with the failure of the agency to include this position in its published regulations. Under 12 U.S.C. § 1749bbb-2(b) the Secretary is authorized to define technical terms "by rules and regulations", and under 12 U.S.C. § 1749bbb-17 "Any rules or regulations of the Secretary shall only be issued after full consultation with the [Advisory] Board and after notice and hearing, if granted, as required by the Administrative Procedure Act." In light of this congressional concern that definitions of terms be established and promulgated in a regular and public manner it would have been preferable for HUD to have included the racial or political motivation test in the published regulations.

kinds of assistance in furtherance of a civil disorder. "Civil disorder" is defined simply as "any public disturbance involving acts of violence by assemblages of three or more persons [resulting in or threatening] . . . damage or injury . . . ." 18 U.S.C. § 232(1). The other relevant penal statute passed in that year, 18 U.S.C. §§ 2101, 2102, involves inciting, committing or aiding a riot. "Riot" is defined as "a public disturbance involving . . . an act [or threat of an act] of violence by one or more persons part of an assemblage of three or more persons . . . [resulting] in damage or injury . . . ." 18 U.S.C. § 2102(a). Although plaintiff makes a respectable argument that these laws and HUD's definition of riot or civil disorder contained in paragraph (C) of the reinsurance contract are inconsistent, we agree neither that any substantial inconsistency can be found, nor, even if any inconsistency could be discovered, that it would make HUD's action improper. As to this latter point, we think that, in view of the fact that these statutes were passed to achieve very different purposes, their terms need not be forced into the same mold. Congress may use a broader term for identifying activities which it chooses to proscribe, and use, or allow an agency to use, a narrower term to identify what losses the federal government shall reimburse.

■ Paragraph (A) of the reinsurance contract, 18 U.S.C. § 232(1) and 18 U.S.C. § 2102(a) all deal with public actions. Paragraph (A) speaks in terms of "tumultuous disturbance of the public peace". The two criminal statutes use very similar language, "public disturbance involving . . . acts of violence", the plain meaning of which is that the act of violence is contemporaneous with, and part of, the public disturbance. They would exclude a covert act which was related to public disturbance only by a causal link. Thus, only paragraph (C) of the reinsurance contract could encompass a covert act and HUD's requirement that some racial or political motivation be shown cannot be seen as inconsistent with the other congressional enactments mentioned above. But in addition to this, HUD's motivation test is quite reasonable. It means that if an act of destruction is not public in the sense that it is openly done, it must be public in the sense of its purpose. After all, the word "civil" (as in civil disorder, civil disobedience, and civil disruption) could appropriately be equated with one of its primary definitions: "the relations of citizens one with another or with the body politic or organized state or its divisions and departments". Webster's Third International Dictionary. If an action is done neither openly or for a public purpose then the term "civil" would be deprived of any meaning. And beyond the definitional problem is the very practical consideration that without some such limitation the scope of paragraph (C) could well reach to any illegal and destructive act at all. We would hesitate to so magnify the breadth of coverage without definite evidence that such was the legislative intent.[5]

5. As pointed out by both parties to this litigation the legislative history of the Urban Property Protection and Reinsurance Act of 1968 includes the following statement:
"It has been pointed out that there has recently been a pattern of losses resulting from intentionally caused fire or other property damage which may or may not be connected in time or place to riots or group activity, but which could be determined to be a form of civil disorder. It is the view of the committee that losses of this nature might be considered by the Secretary when he issues regulations delineating the precise scope of 'losses resulting from riots or civil disorders.'" House Report No. 1585, Committee on Banking and Currency, 90th Congress, 2d Session, at 80, U.S.Code Cong. & Admin. News 1968, p. 2955.
The precatory language of this statement, and its reference to a "pattern of losses" indicates that HUD's disallowance of this claim did not violate congressional intent, particularly in view of the isolated nature of the loss involved. Furthermore, neither this

Under paragraph (C) plaintiff had the burden of bringing to the attention of the agency evidence which would demonstrate that a "civil disorder" had occurred. The court below properly found that plaintiff had failed to do so and that HUD acted in conformity with the reinsurance contract in denying the reinsurance claim.

Affirmed.

nor any other item in the legislative history to which we have been referred is in any way opposed to the motivation test established by the agency.