[No. H002972. Sixth Dist. July 28, 1989.]

EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Cross-complainant and Respondent, v. ROBERT L. BERRY, Cross-defendant and Appellant.

834

COUNSEL

Lawrence K. Handelman, Kenneth E. Bacon and Handelman & Bacon for Cross-defendant and Appellant.

Michael J. Brady, Mark G. Bonino, Robert P. Andris and Ropers, Majeski, Kohn, Bentley, Wagner & Kane for Cross-complainant and Respondent.

OPINION

BRAUER, J.*—This is an appeal from a declaratory judgment that plaintiff Robert L. Berry, a former employee of Fairchild Camera and Instruments Corporation who became totally disabled as a result of "manic-depressive illness," 1) was not covered under a group disability policy issued

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

to Fairchild by defendant The Equitable Life Assurance Society of the United States (Equitable) and 2) has received all benefits due under a group medical/dental policy funded by Fairchild but administered by its agent Equitable.

The group long term disability policy states: "DISABILITIES NOT COVERED: Long Term Disability Benefits are not provided for: Mental or nervous disorders, alcoholism or use of hallucinogenic drugs, except while confined to an institution specializing in the care of such disorders."

The group medical/dental plan states: "The Plan only pays 50% of physician's charges for mental and/or nervous treatment while not confined in a hospital to a maximum benefit of $500 in any one calendar year. Mental or nervous treatment means treatment for a neurosis, psycho-neurosis, psychopathy, psychosis, or mental or nervous disease or disorder of any kind."

Since January 1983, Berry has been totally disabled from his occupation with a diagnosis of "manic-depressive illness." On July 5, 1983, he submitted claims to Equitable under both policies. They were rejected on the basis of the quoted exclusions, except that $500 per year has been regularly paid.

Plaintiff brought suit on September 14, 1984. On June 20, 1985, he filed a second amended complaint which challenged the rejection under both policies and set forth nine causes of action: breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, violation of Insurance Code section 790.03, intentional interference with a protected property interest, intentional infliction of emotional distress, negligent infliction of emotional distress, promissory estoppel and breach of contract. Equitable filed a cross-complaint seeking a declaration that the claims were properly denied.

Concurrent motions for summary judgment were then heard and resulted in a determination that the following facts were undisputed: 1) The group disability policy excludes benefits for disabilities arising from mental or nervous disorders, except while confined to an institution specializing in the care of such disorders; 2) at all relevant times plaintiff was totally disabled from his occupation as a result of manic-depressive illness; 3) he has not been hospitalized for the condition of manic-depressive illness at any time except during a waiting period not subject to coverage; 4) the group medical policy limits benefits to a maximum of $500 a year for mental and/or nervous treatment while not confined in a hospital; 5) manic-depressive illness is a physiological disease of biological depression having an organic etiology, and 6) manic-depressive illness is not a functional mental disorder.

Prior to trial, Equitable moved to sever the cross-complaint for declaratory relief so as to try the issue of coverage before that of the carrier's alleged bad faith. The motion was granted; and on November 6, 1987, the matter proceeded to a two-day court trial culminating in a decision that plaintiff

had received the maximum benefits owed him under the group medical policy and that his claim for group disability benefits was properly denied. The court found 1) the condition of manic-depressive illness is a disability specifically excluded under the policies; the language of the "mental disorder" provisions of the policies is clear and unambiguous, and is not reasonably susceptible of an interpretation that would provide coverage of Berry's condition; 2) the contracts at issue are not adhesive; 3) Berry did not comply with the hospital confinement provisions contained in the two policies; and 4) Equitable has not breached any duty owing to Berry.

On this appeal, Berry challenges each of those findings and in addition claims error in the order of bifurcation and asserts that Equitable is estopped to deny coverage.

## I. BIFURCATION

In the trial court, plaintiff opposed bifurcation primarily on the ground that it would not promote judicial efficiency. He conceded that the interpretation of a contract is essentially a judicial function. Before us, however, he complains that the order of bifurcation deprived him of his right to a jury trial.[1]

The jury question aside, this was a classical case for severance under Code of Civil Procedure section 598: The declaratory relief cross-complaint was scheduled to take two days to try, the bad faith action would have consumed several weeks, a declaratory judgment in favor of defendant would end the lawsuit.

And the jury issue is a red herring. As we will explain in a subsequent section, the interpretation of a written instrument is essentially a judicial function. Where the trial court concludes, after considering extrinsic evidence, that a writing is not reasonably susceptible of a construction urged, there is no issue to be submitted to a jury. Thus, even if bifurcation had not been ordered, the trial court would have been required to hear the evidence bearing on the meaning of the instrument out of the presence of the jury, and the conclusion that court arrived at would have terminated the case. Only if the court had made a contrary finding on the question of ambiguity would it have submitted the credibility of any conflicting evidence to the jury. Thus, as we will have occasion to repeat, the determinative issue in this case is the court's finding that the policy does not lend itself to the construction urged by the plaintiff.

---

[1] When bifurcation was ordered, plaintiff did not demand a jury with regard to the cross-complaint. We could rest our decision on that point but choose to address the merits.

## II. CONTRACT OF ADHESION

This is also a nonissue. The group disability and medical/dental policies were negotiated between Fairchild and Equitable, two entities of comparable economic strength, with Fairchild writing the specifications. In a similar context, where a policy was negotiated between a carrier and an association of hospitals, *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 [204 Cal.Rptr. 435, 682 P.2d 1100] held that the contract was not adhesive even though the plaintiff, a physician and third party beneficiary, did not have similar financial strength. Berry, on the other hand, cites *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178] and *Jones* v. *Crown Life Ins. Co.* (1978) 86 Cal.App.3d 630 [150 Cal.Rptr. 375, 6 A.L.R.4th 826] where the courts focused on the bargaining power of the individual employee rather than on that of the contracting employer vis-à-vis that of the insurance company.

■ But it really doesn't matter whether these insurance policies are labeled adhesive or not because the canons of construction governing insurance contracts are well established and have independent vitality even though the applicable principles undoubtedly grew out of contracts of adhesion.

Thus, exclusions in a policy are strictly construed against the insurer and liberally interpreted in favor of the insured. (*Delgado* v. *Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672]; *Healy Tibbitts Constr. Co.* v. *Employers' Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741, 749 [140 Cal.Rptr. 375, 97 A.L.R.3d 1258].) And, of course, all ambiguities are resolved against the carrier. (*Jones* v. *Crown Life Ins. Co., supra,* 86 Cal.App. 3d 630, 639; *McLaughlin* v. *Connecticut General Life Ins. Co.* (1983) 565 F.Supp. 434.) But if the meaning of the contract is clear, it will be given effect. *Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 710; *Meyers* v. *Guarantee Sav. and Loan Assn.* (1978) 79 Cal.App. 3d 307, 312 [144 Cal.Rptr. 616]; *Yeng Sue Chow* v. *Levi Strauss & Co.* (1975) 49 Cal. App.3d 315, 324 [122 Cal.Rptr. 816].) So here again, the basic issue is whether the trial court was correct in its conclusion that the contract was unambiguous. If it was, the decision is invulnerable even if the contract is adhesive. If it was not, plaintiff does not need the adhesion concept for a predicate of error.

## III. THE MEANING OF THE CONTRACT

### 1. *Plaintiff's contentions*

The relevant exclusions have been previously quoted. The disability policy states that benefits for mental disorders are not payable except while the

patient is confined to a hospital. The medical policy pays physicians' charges for mental treatment to a maximum of $500 a year while the patient is not confined to a hospital. Mental or nervous treatment is defined in the medical policy as treatment for mental or nervous disease or disorder of any kind.

Plaintiff introduced expert evidence that manic-depressive illness was an organic rather than a functional disease caused by a chemical imbalance. Actually he did not need to do so as those facts were conclusively adjudicated pretrial in the summary judgment proceedings. (Code Civ. Proc., § 437c; *Abadjian* v. *Superior Court* (1985) 168 Cal.App.3d 363, 370 [214 Cal.Rptr. 234]; *Cal-Vada Aircraft Inc.* v. *Superior Court* (1986) 179 Cal.App.3d 435, 446 [224 Cal.Rptr. 809].) His expert referred to Berry's disability as a physical rather than a mental illness.

Plaintiff contended that the policies were ambiguous and lent themselves to the construction that the exclusion applied only to disabilities having a functional etiology.

## 2. *The Procedure for Ascertaining the Meaning*

■ Jefferson details the proper procedure where the proponent of extrinsic evidence urges a particular interpretation of a contract upon the court. (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) §§ 32.2, 32.3.) Because plaintiff claims that he was improperly deprived of his right to a jury trial, we will out of an abundance of caution analyze the procedure as it would have been followed in a jury trial. The crucial portion of the treatise therefore is rule (4) of section 32.3.

In a nutshell, the court must conduct a hearing out of the presence of the jury and permit the parties to introduce conditionally or subject to a motion to strike all available evidence on the issue of the meaning to be given to the written instrument. If the evidence has the effect of imparting to the written instrument a meaning of which the instrument is not reasonably susceptible, the extrinsic evidence is stricken. The jury is involved only if the court determines that 1) the wording of the instrument is reasonably susceptible of the interpretation contended for by the proponent of the extrinsic evidence, 2) the extrinsic evidence is relevant to prove the proposed meaning, and 3) the credibility of the proponent's parol evidence is disputed. (*Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131 [104 Cal.Rptr. 486].)

Here, the court actually admitted the evidence rather than admitting it provisionally but it employed the correct yardstick; namely, that in the light of the parol evidence the policies were not reasonably susceptible of the

construction advocated by the plaintiff. Thus it does not matter whether the trial judge struck the parol evidence or discounted it as irrelevant.

In the essentials, the court followed the correct procedure.

### 3. *The Yardstick for Interpreting Insurance Policies*

■ It is hornbook law that words in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) " ' " '[T]he policy should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert' " ' " (*Delgado* v. *Heritage Life Ins. Co., supra,* 157 Cal.App.3d 262, 271) or, we might add, by a physician.

### 4. *The Evidence Before the Trial Court*

Only one witness testified to the intention of the contracting parties and that was Fairchild's consultant on employee benefits who actually drafted the insurance specifications and negotiated with Equitable on behalf of the employer. His testimony was unequivocal: it was the intention to exclude all mental disorder disability from coverage except when the patient was confined in a hospital. Testifying as an expert, he pointed out that such provisions are common in health insurance contracts.

As to Mr. Berry, he has been under the care of physicians constantly since his manic-depressive illness was first diagnosed in 1982. What category of physicians? Only psychiatrists.

Plaintiff's expert Dr. Berger described the nature and manifestations of manic-depressive disorder in these words: "A . . . The disorder is a disorder of the cognitive function. That is thinking and memory and ability to figure things out, intellectual ability. It is a disorder of perception. That is the brain's viewing through the senses. It is a disorder of mood, including very high moods and very low moods. It is a disorder of behavior that includes behavior such as depressed behaviors and highly agitated or manic behaviors. Both the depressed phase and the manic phase of this disease being present with psychosis, and psychosis is the medical term for delusions which are false or improbable beliefs that a person's peers would not accept and hallucinations which are voices that a person hears. . . . "Q . . . Do you have an opinion as to the etiology or cause of manic depression?

"A Yes. The evidence is very strong that this is a genetic illness. That means it is transmitted through the family through the father and mother to the children. And what they give the child is a defect in the metabolism. That means in making and breaking down serotonin and norepinephrine."

Dr. Berger indicated that the most serious psychiatric disorders were caused by physiological disease processes. Among them were manic-depressive illness and schizophrenia. The only psychiatric disorders that, in his view, did not have a physiological but rather a functional cause are ". . . diseases that we would classify as problems in living such as marital disorders, alcoholism, substance abuse, the problems that people have because of the complications of our industrial society."

The Diagnostic and Statistical Manual No. 3 of the American Psychiatric Association (DSM-3), the chief psychiatric diagnostic manual, lists manic-depressive illness as a mental disorder.

## 5. *The Standard of Review*

■ Because the determination whether an ambiguity exists in a contract is one of law, the trial court's ruling is not binding on an appellate court so that our review is de novo. (*Delgado* v. *Heritage Life Ins. Co., supra,* 157 Cal.App.3d 262, 270; *Blumenfeld* v. *R.H. Macy & Co.* (1979) 92 Cal.App.3d 38, 44 [154 Cal.Rptr. 652].)

## 6. *Our Evaluation*

■ Plaintiff's expert described manic-depressive illness as a disorder of cognition and behavior, as psychosis characterized by delusions and hallucinations. Every reasonable layman would view a person manifesting such derangement as suffering from a mental disease.

The policies here in question exclude all mental disease from coverage except when the patient is hospitalized for that ailment, regardless of whether the disability was caused by a chemical imbalance, a blow on the head, being frightened by a black cat, inability to cope or whatever. In the medical plan, the $500 per year limitation affects mental disease of *any* kind. In the disability policy, mental disorders are expressly "not covered." Period. The language of either policy is simply not susceptible of the construction that only functionally but not organically caused mental illnesses are excluded. Manifestation, not cause, is the yardstick.[2] If a policy excludes

---

[2] We are aware that the Arkansas Court of Appeals had recently held to the contrary. (*Arkansas Blue Cross & Blue Shield* v. *Doe* (1987) 22 Ark.App. 89 [733 S.W.2d 429].) We must respectfully disagree with our sister court. If a disorder manifesting nothing but mental symptoms could be classified because of its etiology as a physical disease for insurance

illness of a certain type, that does not mean "one-half" or "one-fourth" of that category.

This conclusion is reinforced by Insurance Code section 10125, first enacted in 1973, which mandates coverage for "mental or nervous disorders" in group disability policies but leaves the scope of such coverage to negotiation between the group policyholder and the insurer. The rather extensive legislative history reflects the lawmakers' concern with and discussion of a number of issues: the desirability of such coverage, its costs, the terms, the need to advise policyholders of its availability, the difference between coverage of hospital and outpatient treatment and the types of institutions in which the treatment will be furnished; but nowhere in the proceedings dealing with the original bill or with the 1983 and 1986 amendments is there the slightest intimation that a distinction is made for any purpose between organically and functionally caused mental illnesses. Indeed, in every word of commentary by legislators or addressed to them, all mental disorders are treated alike. (Papers on file in this court and procured from the California State Archives in response to our request for transmission of all documents bearing on Assem. Bill No. 49 (1973-1974 Reg. Sess.), [Lanterman], Sen. Bill No. 940 (1983-1984 Reg. Sess.), [Robbins] and Sen. Bill No. 2086, (1986-1987 Reg. Sess.), [Robbins].)

The trial court was correct.

Appellants remaining points will not detain us long.

## IV. THE HOSPITALIZATION CLAUSE

Berry makes two arguments under this heading.

■ He first cites cases which discuss the "home confinement" terms of some disability policies and denounce such clauses as requiring a prison-like existence which is frequently counter-indicated from a therapeutic point of view. He then analogizes such provisions to hospitalization requirements. But he can find no decision or even treatise which disapproves of differential coverage in and out of the hospital; and Insurance Code section 10125 by necessary inference sanctions such a disparity in policy treatment.

He then advances the questionable claim that the only justification for the hospitalization clause is the prevention of malingering and fraud. Whereupon he submits, somewhat disingenuously, that the requirement should be disregarded as he obviously is not malingering.

---

purposes, the California rule making a layman's perception the determinant of a policy's meaning would be scuttled in favor of a canon appointing physicians as the arbiters.

But standard contracts, like statutes, address general needs and problems and cannot be hand-tailored for the individual. A taxpayer would not get far in claiming exemption from the income withholding requirement on the ground that he was an honest man. Nor could a lessee who assigned his lease without the consent of his landlord successfully defend against a breach of contract suit by proving that his assignee was a desirable tenant.

We hold that the clause is valid, and that the trial court's finding of noncompliance was compelled by the facts in this case.

## V. ESTOPPEL

■ Evidently, a personnel manager at Fairchild, after speaking to an unknown employee of Equitable, assured Berry that there was disability coverage. *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 512-513 [63 Cal.Rptr. 35, 432 P.2d 731] held that the employer under those circumstances may be the agent of the insurance carrier.

But more is required to raise an estoppel; specifically, detrimental reliance by the plaintiff. (*Hartford Fire Insurance Co.* v. *Spartan Realty Internat.* (1987) 196 Cal.App.3d 1320, 1326-1327 [242 Cal.Rptr. 462].) Here, the only reliance asserted is that he filed a claim for benefits with Equitable. That is insufficient as a matter of law.

Judgment affirmed.

Agliano, P. J., and Cottle, J., concurred.

A petition for a rehearing was denied August 25, 1989, and appellant's petition for review by the Supreme Court was denied October 11, 1989.