[No. A054209. First Dist., Div. Three. June 5, 1992.]

NORTH BAY SCHOOLS INSURANCE AUTHORITY, Plaintiff and Appellant, v.
INDUSTRIAL INDEMNITY COMPANY et al., Defendants and Respondents.

**COUNSEL**

Kronick, Moskovitz, Tiedemann & Girard, Robin Leslie Stewart and Jeffrey
M. Starsky for Plaintiff and Appellant.

Derby, Cook, Quinby & Tweedt, Kent J. Clancy and Andrew B. Downs for Defendants and Respondents.

## Opinion

**WERDEGAR, J.**—North Bay Schools Insurance Authority (North Bay) appeals from a judgment entered in favor of Industrial Indemnity Company and California Insurance Company (Insurers) following cross-motions for summary judgment. The question presented is whether acts of vandalism and arson committed by several people out of the public view may collectively be considered a "riot" for purposes of an insurance policy which employs, but does not define, that term. We conclude they may not; we therefore affirm the judgment.

### Factual and Procedural Background

The underlying facts of this controversy are not disputed. On the afternoon and evening of January 3, 1988, several young people broke into buildings on two neighboring school campuses in the Vallejo Unified School District, ransacked them, and set fire to them. The schools are located approximately two blocks from each other.

Charles Ware declared that about 4 p.m. he and three companions went to Loma Vista Elementary School (Loma Vista). They broke a window, and one of the group climbed through to open the door for the others. They then rifled through the contents of a storage room and set several fires in the room. The fire was reported to the fire department at 4:10 p.m. The four then went to Solano Junior High School (Solano Junior), gained entry by breaking a window, and "trashed" two classrooms.

After leaving Solano Junior, Ware parted company with his three companions. About 6 p.m. he ran into two other friends and told them about his earlier activities. The three youths went to Ware's house for a time, then to Solano Junior. They reentered the classrooms Ware had vandalized earlier, did further damage, then set several fires "in order to destroy fingerprint evidence of our presence there." This second fire was reported at 8:07 p.m.

The three, joined by one of the participants in the earlier activities, went back to Solano Junior a short while later, but police personnel refused them entrance, and they left. They then went to Loma Vista, where one of the new vandals knew the combination to a staff lounge. They ransacked the lounge and set fires in it before leaving. The third fire alarm was at 9:18 p.m.

Ryan Wells declared he participated in the later rounds of vandalism and arson at Solano Junior and Loma Vista. Fires at both schools, he stated, were set in order to "get rid of the evidence" of their vandalism.

The Insurers' "California School Package Policy" insures North Bay and its members, such as Vallejo Unified School District, against certain first party losses to school district property, among other things. The policy provides property coverage of more than $300 million per location, per loss occurrence, subject to a self-insured retention of $100,000 each occurrence. The policy provides in relevant part:

"D.   SELF-INSURED RETENTION.

"1.   The Company shall be liable in each and every loss occurrence irrespective of the number and kinds of risks involved only for the excess over and above an initial net loss to the Insured of the amount stated as the Self-Insured Retention in the Declarations.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"3.   For the purpose of this Section, the following terms are defined and limited as follows:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"b.   LOSS OCCURRENCE shall mean a single event which causes damage or destruction of insured property by a peril or combination of perils insured against. *When the term applies to loss or losses from* windstorm, hail, *riot,* riot attending a strike or civil commotion, *it shall be held to include those losses occurring or commencing during a period of 72 consecutive hours.* When filing proof of loss, the Insured may elect the moment which the 72-hour period shall be deemed to have commenced." (Italics added.)

North Bay demanded the Insurers pay for all property damage to the schools in excess of $100,000. The Insurers rejected North Bay's demand on the ground that the claims involved three separate loss occurrences, thus triggering three separate self-insured retentions of $100,000 per loss occurrence for a total $300,000 self-insured retention.

North Bay filed suit for breach of contract and declaratory relief. It took the position that the actions of the young people in trashing and setting fire to the school buildings constituted a "riot" under the terms of the policy. The Insurers, and subsequently the trial court, disagreed. This appeal followed.

## Discussion

Summary judgment is proper if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ Since the construction of an insurance policy is a matter of law where the underlying facts are not in dispute (*State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 100 [109 Cal.Rptr. 811, 514 P.2d 123]; *Northbrook Excess & Surplus Ins. Co.* v. *Coastal Rescue Systems Corp.* (1986) 182 Cal.App.3d 763, 767 [227 Cal.Rptr. 639]), the appellate court conducts an independent review. (*Mancuso* v. *Southern Cal. Edison Co.* (1991) 232 Cal.App.3d 88, 95 [283 Cal.Rptr. 300]; *Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

■ The sole dispute in the present case is the meaning of the word "riot," which is undefined in the insurance policy.[1] The rules of interpretation of insurance contracts are settled. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.) ■ Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

■ An ambiguity exists when the written language of an instrument is susceptible of two or more interpretations. (*Estate of Russell* (1968) 69 Cal.2d 200, 211 [70 Cal.Rptr. 561, 444 P.2d 353].) The question of ambiguity is one of law. (Evid. Code, § 310, subd. (a); *Equitable Life Assurance Society* v. *Berry* (1989) 212 Cal.App.3d 832, 840 [260 Cal.Rptr. 819].) Any ambiguity in an insurance policy is to be resolved against the insurer in favor of coverage. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) Courts, however, "will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Ibid.*)

---

[1] North Bay does not contend the events could be considered one "loss occurrence" independently from the provision for riot. Nor did it raise such an issue below, arguing only that the events fell within the provision for riot. We therefore do not decide whether there were any other grounds for considering the events one loss occurrence.

Neither party argues that "riot" is ambiguous, and, insofar as relevant here, we find the term as understood by the layperson to be unambiguous.[2] The commonly understood meaning of the term, as discussed hereafter, includes public disturbance or tumult as an essential element. Vandalism, arson or other such acts, destructive as they may be, do not constitute a riot if they are conducted away from public view with the intent they remain unobserved.

The two dictionary definitions of "riot" that could apply to this case are: "1. a noisy, violent public disorder caused by a group or crowd of persons, . . . 2. *Law.* a disturbance of the public peace by three or more persons acting together in a disrupting and tumultuous manner in carrying out their private purposes." (The Random House Dict. (1973) pp. 1235-1236, italics in original.)[3] Both these definitions connote activity that is done in public and before witnesses; they do not include conduct that is surreptitious. The same is true of the dictionary definition North Bay cited below in its motion for summary judgment: "A violent public disorder; specifically: a tumultuous disturbance of the public peace by three or more persons assembled together and acting with a common intent." (Webster's Ninth New Collegiate Dict. (1986) p. 1017.)

The second dictionary definition cited above reflects the common law definition of criminal riot. One court, discussing an issue of civil statutory liability, reviewed the various formulations of the common law rule and distilled the following definition: "a tumultuous disturbance of the peace by a group of three or more persons having a common purpose who act in concert to accomplish their purpose through force or violence." (*A & B Auto Stores of Jones St., Inc.* v. *City of Newark* (1969) 106 N.J. Super 491 [256 A.2d 110, 116], mod. (1971) 59 N.J. 5 [279 A.2d 693, 700] [modification added elements of large numbers of participants and public terror].) Similarly, a federal court determined that the following definition, included in an insurance contract, accorded with the common law concept: "any tumultuous

---

[2]We emphasize, moreover, that the question here is not one of coverage; Insurers are not invoking any *exclusion* for riot and have never denied coverage for the damage. Thus, the dissent's reliance on the interpretive rule affording coverage clauses a broad interpretation and exclusionary clauses a narrow one when an ambiguity exists, is of uncertain relevance.

[3]The dissent suggests a third definition—"violent or wild disorder or confusion"—could apply to the facts here. While the definition might apply factually, it is too broad and vague to be reasonably thought intended in the context of this policy. The definition could take in, for example, a single actor who sowed "disorder" by his "wild" actions; yet no reasonable insured would understand "riot" to refer to the acts of a single unassisted vandal. Implicit, moreover, in the concept of "disorder or confusion" is the element of public disturbance. (See, e.g., Webster's Third New Internat. Dict. (1970) p. 652 [defining disorder in part as "breach of public order: disturbance of the peace of society"].)

disturbance of the public peace by three or more persons mutually assisting one another, or otherwise acting in concert, in the execution of a common purpose by the unlawful use of force and violence resulting in property damage of any kind." (*Providence Washington Insurance Company* v. *Lynn* (1st Cir. 1974) 492 F.2d 979, 982.) Penal Code section 404, cited by North Bay below, is not materially different; it too requires force or violence "disturbing the public peace."[4]

Consequently, although the common law term denoted a crime, the common law meaning has found its way into civil law and the ordinary language. As the foregoing definitions show, the primary civil law and lay usage of "riot," like the common law meaning, refers to criminal activity, and, like the common law definition, requires a public disorder. The term, therefore, does not include crimes committed by groups acting out of public view. (See generally 10A Couch on Insurance (2d ed. 1982) § 42:500, p. 583; 5 Appleman, Insurance Law and Practice (1970) § 3111, p. 377.)

Case law further highlights the "public" aspect of the definition particularly pertinent here. Hidden, destructive acts are not deemed a "riot" merely because, upon discovery, the authorities' responsive or remedial efforts disturb the peace and quiet of the community. "It is a clear doctrine of the common law that a stealthy act of destruction is not transformed into an act of riot because upon later discovery of the damage there is a public disturbance." (*Providence Washington Insurance Company* v. *Lynn, supra,* 492 F.2d at pp. 982-983.) Again, this limitation accords with ordinary usage; terrorists who hide a bomb in a public building, for example, do not commit a "riot" merely because the resulting evacuation and closure create public disorder.

North Bay argues that even if "riot" ordinarily is limited to situations of public tumult, the term should be given a broader meaning here because the policy provision at issue also refers to "riot attending a . . . civil commotion." This reference would be redundant, North Bay argues, if "riot" itself implied public tumult. We disagree. "Civil commotion" denotes a broader, more prolonged disturbance than "riot." "A 'civil commotion' has been defined: [¶] 'An uprising among a mass of people which occasions a serious and prolonged disturbance and an infraction of civil order, not attaining the status of war or an armed insurrection. . . .' " (*Hartford Fire Ins. Co.* v. *War Eagle Coal Co.* (4th Cir. 1924) 295 Fed. 663, 665; see also 5 Appleman,

---

[4]Penal Code section 404, subdivision (a) states: "Any use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot."

*supra*, at p. 378.) The distinction is indeed suggested by the policy's reference to a riot "attending" a civil commotion; this phrase implies a continuing commotion as the background for an individual riot. Reasonably understood, the two terms are not synonymous.

The undisputed facts of this case show it was not a public disturbance that led to North Bay's loss, but a series of crimes committed out of public view. The acts of trespass, vandalism and arson were not meant to be witnessed, nor insofar as the record discloses, were they witnessed, by anyone except the participants. Two of the youths stated they set the fires in order to prevent their identification. When at Solano Junior they met with exclusion by the police, the perpetrators did not pursue a public confrontation; instead they returned to Loma Vista where they could continue their destruction in private. Whatever public disruption occurred was in *response* to the damaging events. The youths' activities were entirely lacking in the element of public disturbance or tumult which is essential to a riot in both legal and common usage. There was no triable issue of material fact; summary judgment for the Insurers was therefore proper.

Finally, we briefly respond to the dissent's hypothetical drawn from the recent Los Angeles riots, in order to emphasize what is *not* decided here. The dissent suggests that under the definitions we have adopted, damage during the riots to one retail store might be covered because it was committed publicly, while that to a neighboring store would not be covered because it was committed in secret. In passing, it appears the dissent has the likely scenario backward; more likely is the insurer would claim a riot *exclusion* and the insured attempt to escape the exclusion by showing the damage occurred out of public view. In any event, the hypothetical question—what individual acts committed *during* a riot would be covered or excluded under a clause covering or excluding damage from riot—is not even indirectly presented by this case. Here, there was no riot; *all* of the vandalism and arson were committed surreptitiously and out of public view. The same cannot be said, of course, for the recent events in Los Angeles and other cities.

## DISPOSITION

The judgment of the superior court is affirmed.

Chin, J., concurred.

**WHITE, P. J.**—I dissent.

As the majority acknowledges, the sole dispute between North Bay Schools Insurance Authority (North Bay) and Industrial Indemnity Company

and California Insurance Company (Insurers) is the meaning of the word "riot," which is undefined in the insurance policy. The rules of interpretation of insurance contracts are settled. "Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.

"On the other hand, any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates. The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy. Its effect differs, depending on whether the language to be construed is found in a clause providing coverage or in one limiting coverage. Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer. [A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again, any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect; thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764], quotations and citations omitted; see also *Safeco Ins. Co.* v. *Gibson* (1989) 211 Cal.App.3d 176, 180-181 [259 Cal.Rptr. 206].) However, these rules of construction are inapplicable if a provision is unambiguous or is authorized by the Insurance Code. (*Jacobs* v. *Fire Ins. Exchange* (1991) 227 Cal.App.3d 584, 590 [278 Cal.Rptr. 52].)

An ambiguity exists when the written language of an instrument is susceptible of two or more interpretations. (*Estate of Russell* (1968) 69 Cal.2d 200, 211 [70 Cal.Rptr. 561, 444 P.2d 353].) My colleagues claim neither party argues the term "riot" is ambiguous, and the term as understood by the layman is unambiguous. I totally disagree.

There are as many as 14 definitions of the word "riot" in The Random House Dictionary of the English Language.[1] Although the majority of these definitions are inapplicable to the facts in this case, I find three definitions

---

[1]The noun "riot" is defined as follows: "1. a noisy, violent public disorder caused by a group or crowd of persons, as by a group fighting in a tavern or a crowd protesting against another group, a government policy, etc., in the streets. 2. *Law.* a disturbance of the public

which provide possible interpretations of the contract language: "1. a noisy, violent public disorder caused by a group or crowd of persons, . . . 2. *Law.* a disturbance of the public peace by three or more persons acting together in a disrupting and tumultuous manner in carrying out their private purposes. 3. violent or wild disorder or confusion." (The Random House Dict., *op. cit. supra.*) Each of these definitions provides a somewhat different set of circumstances. While two of the definitions require the event to occur in public, the third does not. Thus, the word "riot" is capable of being understood in two or more possible ways and is ambiguous.

Both North Bay and the Insurers rely on Penal Code section 404[2] to define the word "riot," although they arrive at different interpretations. However, the mere fact that the Legislature has defined a term for one purpose does not shelter that word from the normal rules of interpretation. Penal Code section 404 defines "riot" for the purpose of criminal law; the statute was not intended for construing insurance contracts. Here, the language is that of the insurer, not of the Legislature, and the normal rules of interpretation apply. (See *Interinsurance Exchange* v. *Marquez* (1981) 116 Cal.App.3d 652, 656 [172 Cal.Rptr. 263].)

It is for this reason I reject the Insurers' authorities from other jurisdictions. (See *Spring Garden Ins. Co.* v. *Imperial Tobacco Co.* (1909) 132 Ky. 7 [116 S.W. 234]; *International Wire Works* v. *Hanover Fire Ins. Co.* (1939) 230 Wis. 72 [283 N.W. 292]; *Walter* v. *Northern Ins. Co.* (1938) 370 Ill. 283 [18 N.E.2d. 906, 121 A.L.R. 244]; *Salem Mfg. Co.* v. *First American Fire Ins. Co.* (9th Cir. 1940) 111 F.2d 797; *Kent Ins. Co.* v. *Glades Liquors, Inc.* (Fla.Dist.Ct.App. 1982) 418 So.2d 1101; *Hartford Fire Ins. Co.* v. *War Eagle Coal Co.* (4th Cir. 1924) 295 F. 663; *Providence Washington Insurance Company* v. *Lynn* (1st Cir. 1974) 492 F.2d 979.) In each of these cases the court looked to either a state statute or the common law, which defined "riot" for the purpose of criminal law. While the criminal definition of "riot" provides a possible interpretation of the disputed term, there are other definitions for "riot" which do not constitute criminal conduct.

---

peace by three or more persons acting together in a disrupting and tumultuous manner in carrying out their private purposes. 3. violent or wild disorder or confusion. 4. loose, wanton living; profligacy. 5. unrestrained revelry. 6. an unbridled outbreak, as of emotions, passions, etc. 7. a brilliant display: *a riot of color.* 8. *Informal.* something or someone hilariously funny: *He was a riot at the party.* 9. run riot, a. to act without control or restraint: *The neighbors let their children run riot.* b. to grow luxuriantly or abundantly: *Crab grass is running riot in our lawn.*" (The Random House Dict. (1973) pp. 1235-1236, italics in original.)

[2]Penal Code section 404, subdivision (a) states: "Any use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot."

I also question the majority's position that the definition of "riot" necessarily connotes activity that is done in public and before witnesses, and that it does not include conduct that is surreptitious. The unfortunate events which occurred in Los Angeles in April of this year highlight my concerns. If, for example, two Los Angeles retail stores have the same insurance policy as the one in this case, is only that store which is torched and looted before witnesses covered under the policy? Would any damage caused by an act of vandalism or arson during the three-night period be uncovered?

My view that the term "riot" is ambiguous is further supported by the fact that, according to language in the insurance policy, single losses occurring during a 72-hour period include "riot" and "riot attending a strike or civil commotion." If the term "riot" was unambiguous, there would be no need for this redundancy. The majority's distinction between "riot" and "riot attending a strike or civil commotion" is contradicted by the policy. Windstorms, hail, riots and riots attending a strike or civil commotion are all contemplated as prolonged disturbances which may occur for more than 72 hours.

In conclusion, I would hold the term "riot" is ambiguous and this ambiguity must be resolved against the insurers. Accordingly, I would reverse the judgment.