Gordon B. PHILLIPS as guardian
of James G. Phillips, Plaintiff,

v.

LINCOLN NATIONAL LIFE INSUR-
ANCE COMPANY, an Indiana
corporation, Defendant.

No. 90 C 0345.

United States District Court,
N.D. Illinois, E.D.

Sept. 26, 1991.

Stephen C. Voris and Andrew D. James, Burke, Wilson & McIlvaine, Chicago, Ill., for plaintiff.

J. Robert Geiman, David Joseph Novotny, Thomas P. Boylan, and William A. Chittenden, III, Peterson & Ross, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The plaintiff, Gordon B. Phillips, as guardian for his son James G. Phillips, seeks to recover nearly $500,000 in insurance benefits that he claims have been wrongly withheld by the defendant, Lincoln National Life Insurance Company ("Lincoln"). Mr. Phillips has sued Lincoln pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for reimbursement of what he has spent for the care of his sick son. That provision allows beneficiaries and participants in an employee welfare benefit plan to recover benefits due them under the terms of their plan. *Id.*

The dispute requires this court to determine whether the plaintiff's son's condition falls within the meaning of the term "mental illness" in the insurance policy. If James's condition is a "mental illness," then the insurance coverage is a great deal less than if his condition is other than a "mental illness." In his motion for summary judgment, the plaintiff asserts that this court can decide as a matter of law that the policy's provision limiting coverage for mental illnesses does not apply because James's condition *is not* a mental illness. By contrast, the defendant's cross-motion for summary judgment argues that this court can decide as a matter of law that the insurance policy's limitation of coverage for mental illnesses does apply. In addition to moving for summary judgment, both sides seek attorneys fees pursuant to 29 U.S.C. § 1132(g)(1).

### *Facts* [1]

Gordon Phillips was and still is President of Seedburo Equipment Company ("Seed-

buro"). On November 1, 1984, Seedburo executed a group insurance plan with Lincoln which remained in effect until November 1, 1990. The parties agree that the group insurance plan was an employee welfare benefit plan governed by ERISA and that James, as Gordon Phillips' dependent, was a beneficiary of the group plan.

The insurance contract between Lincoln and Seedburo stated in pertinent part:

### MAJOR MEDICAL BENEFITS

Maximum Benefit (Lifetime Aggregate) .......................... $1,000,000

Except that, the Maximum Benefit (Lifetime Aggregate) for charges for mental illness(es) is ..... $25,000

\*　　\*　　\*　　\*　　\*　　\*

### MAJOR MEDICAL LIMITATIONS

The maximum payment for care of mental illness or care of nervous conditions of any type or cause by a doctor will not be more than:

1. $20.00 for each visit; and
2. one visit on any one day; and
3. 50 visits during any calendar year. (A "visit" occurs each time the doctor provides care to the patient.)

\*　　\*　　\*　　\*　　\*　　\*

Illness—means:

1. A disorder or disease of the body or mind; or
2. An accidental bodily injury; or
3. Pregnancy.

Thus, the insurance contract provides a lifetime maximum benefit for major medical expenses of $1,000,000. It limits, however, the lifetime maximum benefit for charges for "mental illness(es)" to $25,000.

Until October, 1987, Lincoln paid the claims submitted on behalf of James for his medical expenses. In October, 1987, the claims paid by Lincoln reached $25,000. Thereafter, Lincoln refused to pay any further claims on James's behalf, insisting that James's condition is a mental illness and that the lifetime limitation of $25,000

---

1. This court bases its review of the facts on the Statements of Uncontested Facts and Responses that the parties have submitted in accordance with General Rule 12 of the Northern District of Illinois.

for care of mental illness applies.[2] From October, 1987 through June, 1990, Mr. Phillips has paid $498,615.41 for James's care without reimbursement from Lincoln and he has continued since June, 1990 to pay his son's medical expenses.

James Phillips suffers from a debilitating condition marked by abnormal behavioral symptoms. His abnormal behavior includes hyperactivity, hyperexcitability and hyperkinesis. He is extremely self-abusive and has attempted suicide on several occasions. Sometimes he eats indiscriminately whatever he can get his hands on. In addition, James has difficulty processing visual stimuli and becomes anxious and overly excited when faced with a new or strange situation. He also needs constant reassurance and needs to hear statements repeated numerous times before he feels secure in his surroundings. James also requires an inordinate amount of attention and constant feedback from the people around him. Although he is not mentally retarded (his I.Q. is considered on the low end of normal), he does have a learning disability.

His condition is congenital and has been diagnosed by several doctors as an organic brain syndrome, meaning that he has a physical abnormality in his brain. His organic brain syndrome has also been termed "congenital encephalopathy." The *Diagnostic and Statistical Manual of Mental Disorders*, Third Edition–Revised ("DSM–III–R"), a comprehensive classification of mental disorders published by the American Psychiatric Association, classifies organic brain syndrome, which is referred to as "organic mental syndrome," as a mental disorder.

Based on psychological testing, doctors believe that James's abnormality is located in the right hemisphere of his brain although they cannot pinpoint its exact location. The results of an electro-encephalogram are consistent with the psychological tests as they place the abnormality in the right posterior part of James's brain. The physical abnormality in his brain is accepted by the parties as the cause of his aberrant behavior.

The focus of James's treatment has been directed toward his behavioral problems and not toward curing the underlying physical problem in the brain. James has been educated in a monitored environment to control and train his behavior. He has also been treated with the medications Lithium and Amoxapine to control his behavior, as well as with Haldol (an anti-psychotic), Ativan (an anti-anxiety and anti-psychotic) and Prozac (an anti-depressant). In addition, James received psychotherapy although it ultimately proved to be ineffective.

## Discussion

Rule 56 of the Federal Rules of Civil Procedure requires this court to enter summary judgment upon either party's motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As mentioned above, however, the material facts in this case are not disputed. Once this court decides the legal question of how the term "mental illness" should be construed, the undisputed facts relating to James's condition can be related to that construction. This court can then rule as a matter of law whether James's condition is

---

**2.** It is unclear for what services Lincoln was providing reimbursement when it paid $25,000 to cover James's medical expenses from November 1, 1985 until October, 1987. The quoted portions of the policy limit coverage to only $1,000 per year for "visits" to doctors for someone suffering from a mental illness. Perhaps the "extra" $23,000 Lincoln paid during the two years from November 1, 1987 until October, 1987 was for treatment other than "visits," but, again, the materials presented to the Court do not reveal for what services the $25,000 was spent. One might think that Lincoln's reimbursing James's full expenses during the first two years of coverage would indicate a waiver of the provision limiting coverage for mental illness or that it constitutes an admission by Lincoln that James is not suffering from a mental illness. As these issues were not argued and briefed, this Court goes no further than to point them out.

or is not within the meaning of "mental illness" as that term is used in the insurance contract.

## A. Determining What Law Applies.

■ The threshold issue which this court faces is the question of what set of interpretive rules should be used in construing the terms of the group plan. Should this court interpret the term "mental illness" according to the relevant state's contract doctrines or according to an evolving federal common law of ERISA pertaining to the interpretation of employee welfare benefit plans?

Had this dispute arisen before Congress passed ERISA, the contract and the term "mental illness" would, of course, have been construed according to the relevant state's laws of contracts. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989). This action, however, is not an action arising under the common law of contracts. Section 502 of ERISA, rather than state contract law, provides the legal basis for the plaintiff's claim. Therefore, the employee welfare benefit plan at issue here must be construed according to a federal common law of interpretation. *See id.* 109 S.Ct. at 954; *Winstead v. Indiana Insurance Co.*, 1987 WL 15750 (N.D.Ill. 1987), *aff'd*, 855 F.2d 430 (7th Cir.1988); *Reiherzer v. Shannon*, 581 F.2d 1266 (7th Cir.1978).

■ The content of the federal common law of interpreting employee welfare benefit plans should be strongly informed by, if not a wholesale adoption of, the doctrines of contract interpretation found in the common law of the relevant state.[3] As the Seventh Circuit has stated:

> When ERISA is silent on an issue, a federal court must fashion federal common law to govern ERISA suits. In making such rules, we must of course, look to the statute itself for guidance ...

and it is also proper to turn to state law when creating such rules as long as such state law is consistent with the policies underlying the federal statute at issue. *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir.1990) (citations omitted). *See also Western Securities Co. v. Derwinski*, 937 F.2d 1276 (7th Cir.1991) (adopting state common law contract doctrines to interpret a contract governed by federal common law).

ERISA itself is silent as to how qualified employee welfare benefit plans ought to be interpreted. In light of that silence, the parties' expectations would be best fulfilled by using as much as possible the familiar common law rules of contract interpretation of the state whose contract laws would have applied had a case been brought for breach of contract. The law should strive to fulfill parties' expectations regarding contracts because doing so will enable people to be more willing to make mutually advantageous contracts. When people do not have to guess about what set of interpretive doctrines will be used to interpret their contracts, they can be more sure of the scope of the obligations they are committing themselves to and of the rights they will be able to enjoy. Federal common law, however, is by its very nature an uncertain and unpredictable creature. Tying federal common law to the established and time-tested state common law of contract interpretation ensures that an undesirable element of "federalized" uncertainty is not introduced into ERISA. Thus, borrowing generously from state law will help facilitate the formation of stable and mutually advantageous employee welfare benefit plans and thereby further the goals of ERISA.

■ Indeed, the considerations just presented suggest that a strong argument could be advanced under *United States v.*

---

3. The relevant state would be the state whose substantive contract laws would have applied had the case been for breach of contract rather than under ERISA, given the choice of law rules of the state in which the federal court hearing the case is located. *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this case, an Illinois court would have applied Illinois contract law. *See Southwest Forest Industries, Inc. v. Sharfstein*, 482 F.2d 915 (7th Cir.1972).

*Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), that state contract law should be adopted wholesale into the federal common law of interpreting employee welfare benefit plans. *See Kunin v. Benefit Trust Life Insurance Co.*, 910 F.2d 534, 539 (9th Cir.1990) (suggesting but not holding that under *Kimbell Foods* state law is incorporated into federal common law of interpreting employee welfare benefit plans). This court need not decide, however, whether *Kimbell Foods*'s three-part test is satisfied. The state common law doctrines of contract interpretation borrowed in this opinion are doctrines of such universal acceptance that they would surely have found their way into the federal common law whether under the authority of *Kimbell Foods* or not.[4]

B.  *Construing the Term "Mental Illness."*

This court now turns to the core of this case, construing the term "mental illness." First, this court must determine whether or not the term "mental illness" is ambiguous. Determining whether a provision in a contract is ambiguous is a question of law for the court to decide. *See Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987); *Wilson v. Illinois Benedictine College*, 112 Ill.App.3d 932, 937, 68 Ill.Dec. 257, 263, 445 N.E.2d 901, 907 (2d Dist.1983).

The insurance policy in this case provides no definition of the term "mental illness." A careful definition in the insurance contract itself could have rendered the term unambiguous. Because there was no such definition, however, this court must consider whether the term "mental illness" is

capable of being understood in more than one sense. If it can be understood in "more than one sense," then it is an ambiguous terms. *See National Tea Co. v. American National Bank and Trust Co.*, 100 Ill.App.3d 1046, 1049, 56 Ill.Dec. 474, 427 N.E.2d 806 (1981); *Standard Steel & Wire Corp. v. Chicago Capital Corp.*, 26 Ill.App.3d 915, 919, 326 N.E.2d 33 (1st Dist. 1975).

There is no question that the term "mental illness" as it is used here is hopelessly ambiguous inasmuch as it is capable of being reasonably understood in more than one sense. This court first takes note of the competing reasonable interpretations of "mental illness" propounded by the parties. Although "[an insurance] policy is not ambiguous merely because the parties advance competing and conflicting interpretations of the specific language," *Auto–Owners (Mutual) Insurance Co. v. L.P. Cavett Co.*, 882 F.2d 1111, 1113 (7th Cir.1989), each of the competing definitions of "mental illness" urged by the parties is reasonable even if not totally satisfactory.

The plaintiff insists in his motion for summary judgment that the term "mental illness" refers only to those illnesses with non-physical causes, such as illnesses traceable to abuse suffered in one's childhood or to other types of traumatic experiences. According to the plaintiff, behavioral problems traceable to an organic or physical cause are other than "mental illnesses." In arguing that the cause of a malady should determine whether or not that malady is a mental illness, the plaintiff largely relies on the construction of "mental ill-

---

**4.** Some courts have taken the position that ERISA's pre-emption provision makes irrelevant state common law doctrines on contract interpretation. *See, e.g., Brewer v. Lincoln National Life Insurance Co.*, 921 F.2d 150 (8th Cir.1990). The pre-emption provision states that with the exception of laws regulating "insurance, banking, or securities," "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144. ERISA's pre-emption provision did not mean to eliminate state law as a model for federal common law, however. Courts like the *Brewer* court overlook the fact that it is still

federal law and not state law being applied even when state law suggests the content of federal law. As the Seventh Circuit has recently observed:

> Suits to enforce contracts with federal agencies are governed by federal common law.... It is true that in determining what particular doctrine to apply in a particular suit, the court will often select a rule of state law. But that determination is itself an interpretation of federal common law: a determination that, for this particular case, the federal common law rule shall be state law thus-and-so.

*Western Securities Co. v. Derwinski*, 937 F.2d 1276 (7th Cir.1991).

ness" given in *Kunin v. Benefit Trust Life Insurance Company*, 696 F.Supp. 1342 (C.D.Cal.1988), *aff'd* 910 F.2d 534 (9th Cir. 1990). The district court in *Kunin*, which ruled that autism did not fall within the mental illness limitation of a health insurance plan governed by ERISA, accepted the plaintiff's definition of "mental illness" while rejecting other proposed definitions as unreasonable. The definition it endorsed was as follows:

> '[M]ental illness' refers to a behavioral disturbance with no demonstrable organic or physical causes.... [A] mental illness stems from reaction to environmental conditions as distinguished from organic causes.

*Id.* at 1346. That same court later wrote:

> [I]f the general nature of the cause of an illness is known and the cause is organic, the illness should not be encompassed within the term 'mental illness' merely because of a lack of precision in the understanding of its causation.... [M]ental illness is often thought of as having nonphysical, psychological causes, in the Freudian sense, as opposed to an organic basis.... [A] factor which can distinguish mental illnesses is their causation by environmental factors, such as traumatic experiences or childhood relationships.

*Id.* at 1346–1347. Other courts have also construed the term "mental illness" in the context of a limitation of coverage clause in a health insurance policy to mean behavioral disorders with no demonstrable physical or organic basis. *See, e.g., Malerbi v. Central Reserve Life Ins. Co.*, 225 Neb. 543, 407 N.W.2d 157 (1987).

Lincoln counters by arguing that the cause of a behavioral illness, organic or environmental, does not determine whether or not that illness is a mental illness. Lincoln points out that the coverage limitation for mental illness in the contract at issue limits payment "for care of mental illness or care of nervous conditions of *any type or cause*" (emphasis added). By comtemplating a myriad potential of causes of mental illness, that provision indicates that the existence of a biological cause for a behav-

ioral disorder is not sufficient to conclude that a particular illness is other than a "mental illness."

In addition, deposition testimony from plaintiff's own physicians confirms that the term "mental illness" does not unambiguously refer to a behavioral disorder not traceable to organic causes. Dr. Erin Bigler, a neuropsychologist who has evaluated James, gave the following testimony in deposition:

> Q: In your opinion, Doctor, can there be mental disorders or mental illnesses that are organically based?
>
> A: Yes.

Bigler Dep. at 90. Dr. John R. Bateman, a neuropsychiatrist who has treated James extensively, testified similarly at his deposition:

> Q: Doctor, in your opinion, can a mental illness be organically based?
>
> A: It can.

Bateman Dep. at 159. Their testimony coheres to an intuitive understanding of the physical world. At some level, every mental illness and every pattern of behavior must somehow be traceable to physical phenomena occurring within the nervous system. Indeed, what besides physical phenomena create effects in the natural world? Magic?

Lincoln also states that the term "mental illness" is unambiguous, but it proposes a different definition. According to Lincoln, an illness is a mental illness if its symptoms are extremely abnormal behavior. Lincoln's position that "mental illness" unambiguously means a disease with extremely abnormal behavior has found some support in the courts. For example, in *Brewer v. Lincoln National Life Insurance Co.*, 921 F.2d 150 (8th Cir.1990), the Eighth Circuit stated that the common, lay understanding of the term "mental illness" focuses on the symptoms, not the cause, of the illness. The *Brewer* Court wrote:

> The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses

based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.

Neither policy in this case limited the definition of 'mental illness' to only those illnesses that have a non-organic origin, and the district court should not have adopted a definition that effectively imposed such a limitation. By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons.... [Plaintiff's] disease manifested itself in terms of mood swings and aberrant behavior. Regardless of the cause of his disorder, it is abundantly clear that he suffered from what laypersons would consider to be a 'mental illness.'

*Id.* at 154. *See also Equitable Life Assurance Society v. Berry,* 212 Cal.App.3d 832, 260 Cal Rptr. 819, 824 (1989) ("Manifestation, not cause, is the yardstick" for determining whether an illness is or is not a mental illness).

Although Lincoln is correct that any coherent definition of "mental illness" must include as an important element the presence of aberrant behavioral symptoms, that single element, without more, can not determine that a particular illness is a mental illness. In other words, aberrant behavioral symptoms are a necessary but not sufficient component of any definition of "mental illness." There is no question that some conditions are marked primarily by symptoms of dementia and aberrant behavior yet would not be considered mental illnesses. Indeed, under Lincoln's proposed "unambiguous" meaning of "mental illness," an accident victim who exhibits abnormal behavior as the result of a traumatic head injury, a person suffering from brain cancer who develops unusual behavior and an elderly person who has contracted Alzheimer's Disease would all be considered mentally ill.

■ The facts that James behaves abnormally and that he has received medication, psychotherapy and training to modify his behavior do not necessarily mean that he suffers from a mental illness. Those facts do not preclude the possibility that he might be suffering from a physical illness whose symptoms are behavioral.

Based on the foregoing considerations, this court concludes that the term "mental illness" as used in the contract in issue is ambiguous. Both the plaintiff's and the defendant's proposed definitions have intuitive appeal and partially describe the qualities of a mental illness. Indeed, each side's "unambiguous" definition has carried the day with different courts. In short, each of the proposed definitions of "mental illness" is reasonable but also incomplete.

It may well be that the expression "mental illness" is not susceptible to a single definition of general application. Nonetheless, the term is not meaningless or else it would not be as widely used as it is. "Mental illness" apparently is shorthand for something. It might refer to conditions whose physical origin is very poorly understood and whose symptoms are entirely or almost entirely behavioral or emotional. On the other hand, it might simply refer to a number of conditions with behavioral symptoms which for historical or other non-medical reasons have been lumped together under the umbrella of "mental illnesses."

■ Having determined that the term "mental illness" is ambiguous, this court must next construe the term. If this question were to be answered by looking to state law, there would be no question that an ambiguity must be construed against the insurance company. As the Ninth Circuit observed in *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d at 539, "[a]ccording to the law of California and indeed, every other state as well as the District of Columbia, ambiguities in insurance contracts must be construed against the insurer." The *Kunin* Court was referring to a common application of the general rule of *contra proferentum* which dictates that an ambiguous provision is construed against the person who selected the language. The Ninth Circuit was also correct that Illinois contract law includes the rule of *contra*

*proferentum* and that it would be used in this case if Illinois contract law applied. *See Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). For reasons stated earlier in this opinion, this court will look to state law in determining federal common law and will therefore apply the rule of *contra proferentum* to this case.[5] "It would take a certain degree of arrogance to controvert an opinion held with such unanimity in the various states and to adopt a contrary rule as a federal rule." *Kunin v. Benefit Trust Life Insurance Co.*, 910 F.2d at 540. The rule of construing a contract against the party that drafted it is rooted in sound policy. It induces those who draft contracts to make them as unambiguous as possible.

■ In applying the rule of *contra proferentum*, this court follows the lead of the *Kunin* court which applied the rule in determining whether a limitation of coverage provision for mental illnesses included a limitation of coverage for autism. The *Kunin* court stated:

> It remains only for us to determine if the meaning of the term 'mental illness' is so clear and well fixed that an ordinary reader of the policy would recognize that autism must be included. If not, in light of the rule that ambiguities in the policy must be construed against the insurer, [the plaintiff] must prevail.

*Id.* at 541. In this case it is by no means clear that organic brain syndrome would be recognized as a "mental illness" by the average reader of the insurance policy.

James's problems arise from a physical defect with a particular organ of his body, his brain. The physical defect is demonstrable, James has had it since birth and it is conceded by all to be the cause of James's aberrant behavior. In view of the demonstrable organic and congenital nature of James's condition, characteristics more commonly associated with physical rather than mental illnesses, it is not obvious that James's condition is a mental illness. Therefore, under the rule of *contra proferentum*, this court holds that the limitation of coverage for mental illnesses does not apply to James's organic brain syndrome.

This case demonstrates why all fifty states construe ambiguities in favor of coverage. Because of the defendant's failure to define mental illness, the parties were forced to litigate this dispute. The defendant, with its expertise and experience in drafting insurance contracts, could have anticipated that disputes surrounding the meaning of "mental illness" were likely to arise and could also have resolved the problem in advance by drafting a definition of "mental illness." For example, the contract could have incorporated by reference the classifications of mental disorders provided in the American Psychiatric Association's *DSM–III*. Alternatively, it could have directly defined "mental illness" with regard to the patient's symptoms or the treatment rendered rather than saving such definitions for litigation. Indeed, "[i]nsurance contracts generally spell out in inordinate detail the meaning of terms

5. In *Brewer v. Lincoln National Life Insurance Co.*, 921 F.2d 150 (8th Cir.1990), the Eighth Circuit held that the rule of *contra proferentum* does not apply to ERISA cases. The *Brewer* Court seized on the holding of the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In that case, the Supreme Court determined that a denial of benefits under a plan governed by ERISA was to be reviewed de novo rather than reviewing the decision of the plan's administrator according to a deferential "arbitrary and capricious" standard. The eighth circuit held that because ERISA plans are subject to de novo review, neither party's construction should be favored. This court does not read *Firestone* so broadly. The fact that a decision is subject to de novo review has no bearing on the

applicable rules of construction. As the Supreme Court asserted in *Firestone*, "The trust law de novo standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA. Actions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law." *Id.* at 112. The Supreme Court in *Firestone* did not reject established views of plan interpretation when it held that courts should perform a de novo, rather than a deferential, review of a plan administrator's decision. Similarly, even though a baseball umpire reviews a close play without deferring to either the runner or the fielder, the umpire is still bound by the rule that the "tie goes to the runner." *See Kunin*, 910 F.2d at 541.

that lack a fixed meaning. Great efforts are ordinarily made to eliminate the natural ambiguity that exists in so many of the words and phrases we use daily." *Id.* at 541.

### Attorney's Fees

■ Finally, this court turns to the question of whether plaintiff is entitled to an award of attorney's fees. The Seventh Circuit has designated five factors for this court to consider when faced with a motion for attorney's fees under ERISA:

1. The degree of the offending parties' culpability or bad faith;
2. The degree of the ability of the offending parties to satisfy personally an award of attorneys' fees;
3. Whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances;
4. The amount of benefit conferred on members of the pension plan as a whole;
5. The relative merits of the parties' positions.

*Janowski v. International Brotherhood of Teamsters Local No. 710 Pension Fund,* 673 F.2d 931, 940 (7th Cir.1982).

This court concludes, based on those factors, that an award of attorney's fees is not warranted. There is no evidence from this record that the defendant acted in bad faith, a conclusion buttressed by the fact that this court determined that the "mental illness" provision in this policy was ambiguous. In addition, there would be little deterrent value to other parties if this court were to sanction the defendant for conduct it found to be tenable. Finally, although the plaintiff prevailed, the defendant's position was far from meritless. As discussed in this opinion, courts have decided the same questions addressed today in a variety of different ways.

### CONCLUSION

For the foregoing reasons this court grants the plaintiff's motion for summary judgment and denies the defendant's motion for summary judgment. As a result,

the $25,000 mental illness limitation does not apply. The parties' motions for attorney's fees are denied.